RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0166p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

POWER & TELEPHONE SUPPLY COMPANY, INC.,
*Plaintiff-Appellant,*

*v.*

No. 05-5966

>

SUNTRUST BANKS, INC.; SUNTRUST BANK;
SUNTRUST BANK - ATLANTA; SUNTRUST BANK -
NASHVILLE, N.A.; SUNTRUST EQUITABLE
SECURITIES CORPORATION; SUNTRUST CAPITAL
MARKETS, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 03-02217—Jon Phipps McCalla, District Judge.

Argued: April 26, 2006

Decided and Filed: May 17, 2006

Before: GUY, DAUGHTREY, and CLAY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Cannon F. Allen, ARMSTRONG ALLEN, Memphis, Tennessee, for Appellant.
S. Lawrence Polk, SUTHERLAND, ASBILL & BRENNAN, Atlanta, Georgia, for Appellees.
**ON BRIEF:** Cannon F. Allen, Amy M. Pepke, Sara Falkinham, ARMSTRONG ALLEN, Memphis,
Tennessee, for Appellant. S. Lawrence Polk, Elena C. Parent, SUTHERLAND, ASBILL &
BRENNAN, Atlanta, Georgia, for Appellees.

———————————

## OPINION

———————————

RALPH B. GUY, JR., Circuit Judge. Plaintiff Power & Telephone Supply Company, Inc.
(P&T), brought this action against the interrelated SunTrust defendants seeking to recover $6 million
in costs incurred under two derivative interest rate "swap" agreements that P&T entered into as a

hedge against increases in the variable interest rate on its syndicated lines of credit.[1] P&T's third amended complaint asserted claims against the SunTrust defendants under theories of breach of contract, breach of fiduciary duty, agency, negligence, common law suitability, deceptive trade practices in violation of the Tennessee Consumer Protection Act (TCPA) (Tenn. Code Ann. § 47-18-109(a)(1)), and illegal tying under the Bank Holding Company Act (12 U.S.C. § 1972).[2] The district court first dismissed some of P&T's claims, and then granted summary judgment to defendants on the rest. Defendants brought a counterclaim seeking indemnification for the attorney fees and costs incurred in defending this action. The district court granted summary judgment to defendants on their counterclaim, and subsequently entered judgment in defendants' favor in the amount of $802,535.93.

On appeal, P&T challenges the dismissal of (1) its intentional misrepresentation claim for failure to satisfy Fed. R. Civ. P. 9(b), and (2) its claim under the TCPA as barred by the one-year statute of limitations set forth in Tenn. Code Ann. § 47-18-110. Also, while abandoning its claim for breach of fiduciary duty, P&T contends that the district court erred in granting summary judgment to defendants on its negligence claim. Finally, P&T argues that the district court erred in finding that defendants were entitled, either singly or collectively, to indemnification under one or more provisions of the written agreements. No challenge is made to the reasonableness of the amount of the judgment. After review of the extensive record and the arguments presented on appeal, we affirm.

## I.

P&T Supply, a Tennessee corporation headquartered in Memphis, distributes telecom products to telephone, communications, and cable companies. P&T used the banking services of First Tennessee Bank for many years, including a syndicated line of credit (SLOC) for working capital and inventory purchases. First Tennessee was the lead bank on that syndicated credit facility. SunTrust–Nashville participated in the SLOC for the first time in August 1996, and finally succeeded in replacing First Tennessee as P&T's primary bank in November 1998. In soliciting P&T's business, SunTrust made two presentations central to P&T's claims in this case.

The presentations, made in September 1996 and January 1997, pitched the investment banking services and products of SunTrust Capital Markets (and its subsidiary SunTrust Corporate Finance (STCF)), including syndicated credit facilities, term loans, private placements, and derivative interest rate swaps. P&T alleges that the SunTrust defendants misrepresented the level of care that would be taken in providing such services. In particular, P&T relies on the following statements from the written materials that described the "advantages" of STCF's services:

▸　　STCF works almost exclusively with clients and prospects of its banks. This creates a high level of accountability.

---

[1] An "interest-rate swap" is a derivative contract between two parties who agree to exchange or "swap" the interest payments that would arise on hypothetical loans of the "notational amount"—one party paying at a fixed interest rate and the other at a variable interest rate—with the payments calculated at specified intervals. The notational amount does not change hands, only the difference between the fixed-rate interest payments and the variable-rate interest payments. Which party is "in the money" at the agreed points in time depends on whether the variable rate exceeds the fixed rate or vice versa.

[2] The SunTrust defendants are: SunTrust Banks, Inc., the parent company of SunTrust Bank and SunTrust Capital Markets; SunTrust Bank, into which SunTrust Bank–Nashville and SunTrust Bank–Atlanta were consolidated; and SunTrust Capital Markets, which was also known as SunTrust Equitable Securities Corporation (STES) during times relevant to this action.

> ► We are dedicated to doing what is right for our clients, not just doing a deal. To us, every deal is an advisory assignment.

> ► Our seasoned professional staff has amassed an average of 14 years of experience in a diverse range of financial and corporate positions.

> ► A senior level product specialist is in charge of every deal – from start to finish.

> ► Every deal is important to us and warrants the highest level of service.

Also, in pitching their lending syndication services, the materials from both presentations stated that STCF would assist throughout the process, "helping [clients] structure a marketable transaction that best meets the company's needs," and would stay involved after the transaction is completed, "thereby facilitating conversation regarding future transactions and reinforcing our role as financial advisor." With respect to "risk management," the materials stated: "We take seriously our responsibility to recommend only those strategies that are appropriate for our customers and will not recommend an inappropriate or high risk transaction."

In April 1997, only a few months after the second presentation, First Tennessee and SunTrust proposed that P&T hedge against rising interest rates on the SLOC and discussed the relative risks and benefits of an interest-rate cap versus an interest-rate swap. P&T rejected SunTrust's proposed swap, and decided instead to purchase a five-year interest rate cap at 8% on a notional amount of $20 million. P&T did not move the SLOC to SunTrust until November 1998, more than a year-and-a-half after the second presentation, and did not enter the swap agreements at issue until July 1999 and July 2000, respectively.

In November 1998, when the existing SLOC matured, SunTrust–Nashville took over as P&T's primary bank and became the lead lender on a new $60 million SLOC. The new SLOC, or credit facility, was documented by Restated Credit and Restated Security Agreements, which explicitly provided that nothing in them or any related documents created a fiduciary relationship between P&T and either SunTrust or any participating lender.

In June 1999, as P&T's borrowing under the SLOC grew, SunTrust proposed that P&T enter an interest-rate swap to hedge against increases in the variable interest rate on its higher loan balances. SunTrust Equitable Securities Corporation (STES) presented P&T with a written proposal that explained the swap, disclaimed any advisory role on the part of SunTrust, and advised that P&T should determine the risks and merits of the transaction without reliance on SunTrust "or its affiliates." That proposal was accepted and P&T entered into a five-year swap on a notional amount of $20 million, under which P&T would pay at a fixed rate of 6.56% and SunTrust–Atlanta would pay at a floating rate tied to the London Interbank Offered Rate (LIBOR).

As is typical of such contracts, the swap was governed by a master agreement and confirmation setting forth the particulars of the transaction. The master agreement (an International Swap Dealers Association (ISDA) Master Agreement) included SunTrust–Atlanta's terms of dealing and risk disclosures, which, in turn, expressly disavowed the existence of any advisory or fiduciary relationship absent an express written undertaking by SunTrust. The confirmation incorporated the master agreement, acknowledged the terms of dealing and risk disclosures, and specifically acknowledged that the transactions involved certain risks. The risks identified included: (1) that the swap may increase or decrease in value with a change in interest rates (market risk); and (2) that the swap could not be terminated quickly at or near its value (liquidity risk).

The 1999 Swap was initially favorable to P&T because interest rates rose 1% over the next year. P&T received quarterly statements reflecting that the 1999 Swap had a positive "unwind value" of $90,000 in December 1999, $170,998 in April 2000, and $475,362 in May 2000. Rising demand for credit in the spring of 2000 led P&T to seek an increase in the SunTrust SLOC and caused further concern about the risk of rising interest rates. STES prepared a comparison of estimated costs for the following scenarios: (1) if P&T did not choose to further hedge its borrowing; (2) if it simply added a second interest-rate swap on a notational amount of $15 million; or (3) if it unwound the favorable 1999 Swap for cash value and entered a newly restructured interest rate swap on a notational amount of $35 million. P&T decided to keep the 1999 Swap and enter into a second swap on a notational amount of $20 million under which P&T would pay at a fixed rate of 7.37% and SunTrust–Atlanta would pay based on the LIBOR.

This second swap, effective July 3, 2000, was memorialized by a confirmation that incorporated the earlier master agreement, acknowledged the market and liquidity risks of the transaction, and again disavowed any advisory or fiduciary relationship unless expressly agreed to in a written engagement letter. In an August 2000 Loan Commitment Letter, SunTrust and STES agreed to provide P&T with a new $75 million SLOC. The terms of the Commitment Letter included as a condition that P&T hedge at least 50% of the SLOC and required cross-collateralization of the SLOC and the swaps. P&T alleges that the second interest rate swap was entered into at defendants' urging and in anticipation of the hedging requirement. The new $75 million SLOC was executed in October 2000.

Interest rates, specifically the LIBOR, began dropping dramatically in November 2000. P&T's borrowing under the SLOC also fell off, steadily declining from a high of approximately $60 million in June 2000, to approximately $40 million in February 2001, $20 million in October 2001, $10 million in December 2001, and $0 in February 2002. As a result, while P&T's obligations under the SLOC fell, P&T's quarterly obligations under the swap agreements grew. Market-to-market estimates of the cost to unwind the now unfavorable swaps were provided to P&T and reflected liability of approximately $1.5 million in March 2001, $2.2 million in July 2001, and $3.5 million in November 2001. P&T held the swaps until October 2002, when P&T's decision to move the SLOC to another bank triggered SunTrust's right to terminate the swaps at a cost to P&T of $3,475,500.

P&T filed the original complaint in state court on March 13, 2003, and defendants removed it to federal court. Successive motions to dismiss and to amend the complaint followed, and P&T filed a first, second, and third amended complaint seeking to recover approximately $6 million allegedly incurred as a result of the interest-rate swap agreements. P&T asserted various claims based on the contention that defendants deceived it into believing they were acting as "financial advisors," and then recommended the swaps to hedge against rising interest rates when the swaps were inappropriate and resulted in over-hedging of the debt. Defendants filed a motion to dismiss the Third Amended Complaint, which was granted in part and denied in part. While dismissing claims for breach of contract, misrepresentation, unfair trade practices, common law suitability, and unlawful tying, the district court found that the breach of fiduciary duty, agency, and negligence claims survived on the narrow grounds that P&T should be afforded an opportunity to produce any written agreements evidencing that SunTrust undertook a fiduciary relationship with P&T.

P&T promptly filed a motion for reconsideration and clarification of that order with respect to the claims for misrepresentation, breach of fiduciary duty, and deceptive trade practices. Before that motion was decided, defendants moved for entry of summary judgment in their favor both on P&T's remaining claims and on their counterclaim for indemnification. P&T, in turn, moved to dismiss defendants' counterclaim. On May 10, 2005, the district court denied reconsideration of the dismissal order and granted summary judgment to defendants on P&T's remaining claims. On

May 11, 2005, the district court entered an order with respect to the counterclaim, denying P&T's motion to dismiss and granting summary judgment in favor of the defendants. Judgment was entered in favor of defendants, and this appeal followed.

**II.**

### A.      Motion to Dismiss

Our review of the district court's decision to dismiss claims under Fed. R. Civ. P. 12(b)(6) is *de novo*. *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998). We must "construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001). The court need not accept legal conclusions or unwarranted factual inferences as true. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

### 1.      TCPA

The Tennessee Consumer Protection Act (TCPA) provides a cause of action for one who suffers an ascertainable monetary loss as a result of another's unfair or deceptive acts. TENN. CODE ANN. § 47-18-109(a)(1). An action under this section must be brought within one year from discovery of the unlawful act or practice. TENN. CODE ANN. § 47-18-110. In Tennessee, "a cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered." *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680 (Tenn. 1990).

P&T argues that the district court misapplied Tennessee's discovery rule by failing to recognize that knowledge sufficient to put a plaintiff on notice requires "not only an awareness of the injury, but also the tortious origin or wrongful nature of that injury." *Shadrick v. Coker*, 963 S.W.2d 726, 734 (Tenn. 1998). That same case further adds, however, that a plaintiff may not wait to file suit until after all of the injurious effects or the specific type of legal claim are known. *Id*. Applying this standard *de novo*, we find the district court did not err in concluding that this claim was time barred.

Since this action was commenced on March 13, 2003, we are concerned with what P&T knew or should have known before March 12, 2002. P&T alleged that the "SunTrust Entities" deceived P&T into believing that they would act as "financial advisors," that the swap transactions would be suitable and appropriate tools to manage the risk of rising interest rates, and that the swaps could be renegotiated if interest rates fell. P&T started paying on the first swap in July 2000, the second swap was executed in October 2000, and variable interest rates dropped dramatically beginning in November 2000. Over the next year, it is alleged, P&T's borrowing fell steadily and virtually eliminated the need to hedge against rising interest rates under the SLOC. At the same time, the independent obligations under the swaps grew substantially. P&T made quarterly payments under the swaps and was aware that the cost to unwind the swap transactions increased from $1.5 million in March 2001 to $3.5 million in November 2001. Taken together, the circumstances as alleged demonstrated that P&T knew or should have known that it incurred financial injury as a result of defendants' allegedly deceptive practices before March 12, 2002.[3]

---

[3]P&T faults the district court for relying on an internal P&T email that was attached to the complaint as an indication that P&T began investigating the repercussions of the 1999 and 2000 Swap Agreements in October 2000. The email, in fairness, did not directly question the appropriateness of the swaps, but raised

### 2.          **Intentional Misrepresentation**

Intentional misrepresentation is analyzed as a claim for fraud under Tennessee law. *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998). As such, it must be stated with particularity, and the plaintiff must, at a minimum, allege the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud. FED. R. CIV. P. 9(b); *Coffey v. Foamex, L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993). The elements of a fraud claim are: (1) an intentional misrepresentation of material fact; (2) the misrepresentation was made "knowingly," "without belief in its truth," or "recklessly without regard to its truth or falsity"; (3) the plaintiff reasonably relied on the misrepresentation and suffered damages; and (4) the misrepresentation relates to an existing or past fact, or, "if the claim is based on promissory fraud, then the misrepresentation must 'embody a promise of future action without the present intention to carry out the promise'[.]" *Stacks v. Saunders*, 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990) (internal quotation marks and citations omitted).

P&T alleged generally that defendants misrepresented their intent to act as a financial advisor, the appropriateness of the swaps, and the ability to renegotiate the swaps if they became unfavorable. The district court dismissed this claim for failure to specifically allege the circumstances of the purported misrepresentations, the defendants' fraudulent intent, or the fraudulent scheme. Apparently acknowledging the lack of specificity, P&T has narrowed the focus of this claim to the representations found in the written materials from the 1996 and 1997 sales presentations because those materials were attached to the complaint.

The essence of the claim based on the sales presentations is that, in pitching P&T's business, defendants misrepresented the intention to act as a financial advisor to P&T. Statements of future intention, opinion, or sales talk are generally not actionable because they do not involve representations of material past or present fact. *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982). The representations at issue, set out in the statement of facts, involved generalized sales talk and not representations of existing or past fact. Instead, P&T claims that those representations induced P&T into believing that defendants would act as P&T's financial advisor.[4]

Fraudulent inducement, recognized in Tennessee as promissory fraud, requires that the misrepresentation be made without the present intention to carry it out. Neither the failure to in fact keep the promise, nor the plaintiff's subjective impression will demonstrate that there was no present intention to carry out the promise. *Oakridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 29 n.2 (Tenn. Ct. App. 1992). P&T did not allege that defendants promised to act as a financial advisor without the present intention to do so if they were to secure P&T's corporate finance business. Nor has P&T alleged that the representations made during the sales presentations in 1996 and 1997 were part of a scheme intended to induce P&T to enter into unsuitable swap

_____

concern about several terms of the proposed 2000 SLOC (including the cross-collateralization of the swaps). Nonetheless, the email did suggest that P&T recognized as early as October 2000 that SunTrust may not have been acting in P&T's best interest. The email, sent to P&T's acting CFO Boyd Pollard and CEO Jim Pentecost, raised several concerns about terms of the 2000 SLOC and stated: "If they ask why, I would tell them that you feel you are being taken advantage of and that being taken advantage of is not one of your long term goals."

[4]Although defendants argue that the parol evidence rule bars consideration of the representations made during the sales presentations, it does not apply to claims of fraudulent misrepresentation inducing a contract. *Lipford v. First Family Fin. Servs., Inc.*, No. W2003-01208-CV, 2004 WL 948645, at *2-3 (Tenn. Ct. App. Apr. 29, 2004) (unpublished) (discussing cases).

agreements in 1999 and 2000.  If anything, the representations were made to induce P&T to work with SunTrust generally; not to induce P&T to rely on its advice in entering the swap agreements more than two years later.

**B.      Summary Judgment**

We review the district court's decision granting summary judgment *de novo*.  *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).  Summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  In deciding a motion for summary judgment, the court must view all factual evidence and draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986).

**1.      Negligence**

To establish a claim for negligence, a plaintiff must demonstrate (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation.  *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993).  Both the motion to dismiss and the motion for summary judgment focused on the question of duty, the existence of which is entirely a question of law for the court.  *Id.*  The court must determine whether "'upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of others–or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant."  *Id.* at 869-70 (quoting *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 859 (Tenn. 1985)).

Tennessee common law generally does not impose fiduciary or similar duties on banks with respect to their customers, depositors, or borrowers absent special circumstances.  *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546, 550 (Tenn. 1996); *Oak Ridge Precision*, 835 S.W.2d at 30.  This rests on the recognition that bank-depositor or debtor-creditor relationships generally involve arm's-length dealings.  The district court concluded that no fiduciary or advisory relationship had been established with respect to the swap transactions in this case.  As a result, the district court granted summary judgment to defendants on the agency and breach of fiduciary duty claims.  While that decision has not been appealed, P&T takes issue with the district court's further decision to grant summary judgment to defendants on the common law negligence claim because the only recognized legal duty asserted in support of that claim was a fiduciary duty to evaluate and advise P&T on the appropriateness of the swap transactions.

To avoid the legal conclusion that there was no duty to advise P&T regarding the appropriateness of the swaps, P&T contends that it has asserted a claim for "professional negligence" for which a duty to exercise reasonable care arises as a matter of law, and the standard of care may be established from expert witness testimony regarding banking industry standards.[5]

---

[5]To demonstrate breach of the standard of care, P&T relied on opinions from several expert witnesses to show that defendants failed to comply with industry standards for evaluating the appropriateness of derivative transactions.  In particular, the experts opined that, among other things, defendants failed to meet industry standards by failing to evaluate the appropriateness of the swaps for P&T's asset-based business, failing to recognize that the swaps would result in over-hedging of the interest-rate risk, and recommending the swaps despite having reason to believe P&T's management did not fully understand the risks of the swap transactions.  P&T also claims that breach of the standard of care is demonstrated because banking regulators expect banks to determine the appropriateness of derivative transactions.  The bulletin, Office of Controller of Currency Regulation Banking Circular 277 (BC-277), requires banks to assess

There being no cases applying a professional negligence standard to a bank-customer relationship, P&T relies on the general articulation of such claim in *Wood v. Clapp*, 36 Tenn. (4 Sneed) 65 (1856). In *Wood*, a medical malpractice case, the Court explained:

> [A]ny one who assumes to be qualified for the exercise of any profession, art, or vocation, is responsible for any damage which may result to those who employ him from the want of the necessary and proper knowledge, skill, and science which such profession demands. . . . He impliedly contracts with those who employ him that he has such skill, science, and information as will enable him properly and judiciously to perform the duties of his calling. . . . This is the general rule applicable to all professions and avocations in which men are employed to act for others in any particular department of business requiring skill, art, or science.

*Id*. at 66-67. The premise of this standard is, of course, that the individual undertook or was engaged to perform professional services. *See Dooley v. Everett*, 805 S.W.2d 380, 384-85 (Tenn. Ct. App. 1990) (holding pharmacist is professional).

Here, P&T argues that this standard should apply because defendants held themselves out to be "market professionals" and "financial advisors"; provided training to their managers on how to develop relationships and be "successful financial advisors"; and assumed a duty to recommend only "appropriate" derivative products. In other words, this claim rests on the alleged undertaking to act as P&T's financial advisor in connection with the swap transactions. Calling this a professional negligence claim does not make it distinct from a claim for breach of fiduciary duty. Because P&T has not demonstrated that defendants owed it a legal duty to advise it on the appropriateness of the swap transactions distinct from the agency and breach of fiduciary duty claims, we find the district court did not err in granting summary judgment to defendants on P&T's professional negligence claim.

## 2.    Indemnification

Tennessee adheres to the American Rule under which prevailing parties pay their own attorney fees absent statutory authorization, agreement of the parties, or other exception. *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985). Attorney fees and costs are recoverable under an express indemnity contract "if the language of the agreement is broad enough to cover such expenditures." *Id*. The contractual language must be construed as written and enforced according to its plain an unambiguous terms. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002).

The district court found that defendants were entitled to indemnification for the amount of reasonable attorney fees and costs incurred in connection with this action under some but not all of the indemnity provisions on which defendants relied. P&T argues on appeal both that it was not obligated under any of the indemnity clauses, and that it was error to find that the defendants could recover collectively. Addressing only those provisions that the district court found entitled defendants to indemnification—§ 10.4(iii) of both the 1998 and 2000 Restated Credit Agreements;

---

whether a transaction is consistent with a counterparty's policies and procedures. Regulators have clarified, however, that this "appropriateness" assessment is not for the protection of customers but is rather to ensure that banks are conducting this business in a safe and sound manner.

§ 14(l) of the 1998 Restated Security Agreement; and ¶ F.1 of the 2000 Loan Commitment Letter—we affirm.[6]

### a.          2000 Loan Commitment Letter

The Loan Commitment Letter, to which SunTrust Bank and STES were parties, included the following indemnification provision in paragraph F.1:

> *Indemnification.* You further agree to indemnify and hold harmless SunTrust Equitable Securities and each Lender (including SunTrust Bank) and each director, officer, employee, affiliate, and agent thereof (each, an "*Indemnified Person*") against, and to reimburse each Indemnified Person, upon its demand, for any losses, claims, damages, liabilities or other expenses ("*Losses*") incurred by such Indemnified Person insofar as such Losses arise out of or in any way relate to or result from this Commitment Letter, the Fee Letter or the financing contemplated hereby, including, without limitation, Losses participating [sic] in any legal proceeding relating to any of the foregoing[.] . . . Your obligations under this paragraph shall remain effective whether or not definitive financing documentation is executed and notwithstanding any termination of this Commitment Letter.

The plain meaning of this language provides indemnification for any expenses that "arise out of or in any way relate to or result from this Commitment Letter, the Fee Letter, or the financing contemplated hereby including losses [from] participating in any legal proceeding relating to any of the foregoing."

P&T alleged among the general allegations (and incorporated into each count) the averment that the "SunTrust Entities" wrongfully and imprudently required as a condition of the loan Commitment Letter that P&T hedge at least 50% of the 2000 SLOC and that the loan be cross-collateralized. It is further alleged that while the terms of the commitment were being negotiated, P&T entered into the second swap in anticipation of and to satisfy that requirement. Moreover, P&T claimed specifically in Count VIII that the 50% hedging and cross-collateralization requirements constituted unlawful tying. We find that the attorney fees and costs incurred in this litigation arise out of, relate to, or result from the terms of the Commitment Letter itself. Without contesting this on appeal, P&T argues instead that this indemnity provision was superceded by the 2000 Restated Credit Agreement that was contemplated by the Commitment Letter. The integration clause in the Restated Credit Agreement, § 10.14, stated:

> This Agreement, the other Credit Documents, and the agreements and documents required to be delivered pursuant to the terms of this Agreement constitute the entire agreement among the parties hereto and thereto regarding the subject matters hereof and thereof and supersede all prior agreements, representations and undertakings related to such subject matters.

"Credit Documents" are further defined as "this Agreement, the Notes, the Subsidiary Guaranties, the Security Agreement, and all other instruments, documents, certificates, agreements and writings executed in connection herewith, and any amendments thereto or restatements thereof." Relying on the fact that the Commitment Letter preceded the Credit Agreement by two months, P&T argues that

---

[6]We do not address the other provisions under which defendants asserted a right to indemnification: § 10.4(i) of the 1998 and 2000 Restated Credit Agreements; § 11 of the ISDA Master Agreement; and the First Amended and Restated Revolving Credit Note.

the Commitment Letter was not executed "in connection with" the Credit Agreement. As the district court found, however, the plain meaning of this language does not limit "credit documents" to agreements executed contemporaneously with the Credit Agreement. Because other of the credit documents were not executed at the same time, the phrase "in connection herewith" must mean connected in other than a temporal sense.

Finally, P&T contends that the indemnity clause in the Commitment Letter was superceded because it is inconsistent with the narrower indemnity clause found in § 10.4(iii) of the Restated Credit Agreement. On the contrary, this action "arises out of" or "relates to" the terms of the Commitment Letter itself, which allegedly resulted in the second unsuitable swap transaction and constituted unlawful bank tying. Moreover, the indemnity clause in Paragraph F.1. expressly states that it is to have effect "whether or not definitive financing documentation is executed and notwithstanding any termination of this Commitment Letter."

### b.    Restated Credit Agreements

The 1998 and 2000 Restated Credit Agreements contain the same language in § 10.4(iii), which states that the Borrower, P&T, shall:

> [I]ndemnify the Agent and each Lender, and their respective officers, directors, employees, representatives and agents from, and hold each of them harmless against, any and all costs, losses, liabilities, claims, damages or expenses incurred by any of them (whether or not any of them is designated a party thereto) (an "*Indemnitee*") arising out of or by reason of any investigation, litigation or other proceeding related to any actual or proposed use of the proceeds of any of the Loans or any Consolidated Company [P&T and its subsidiaries] entering into and performing of the Agreement, the Notes, or the other Credit Documents, including, without limitation, the reasonable fees actually incurred and disbursements of counsel incurred in connection with any such investigation, litigation or other proceeding, *provided, however*, Borrower shall not be obligated to indemnify, any Indemnitee for any of the foregoing arising out of such Indemnitee's gross negligence or willful misconduct[.]

The district court found this indemnity clause encompassed attorney fees and costs because this litigation was "related to" P&T's "entering into and performing of . . . other Credit Documents" namely, the Swap Agreements and the Restated Security Agreement. Again, "Credit Documents" are defined to mean, collectively, "this Agreement, the Notes, the Subsidiary Guaranties, the Security Agreement, and all other instruments, documents, certificates, agreements and writings executed in connection herewith[.]"

Unlike the district court, we find it a stretch to conclude that the first swap agreement, not contemplated at the time and not entered into until July 1999, could have been made "in connection with" the Restated Credit Agreement from November 1998. Nonetheless, we find both that that the second swap agreement was "executed in connection with" the 2000 Credit Agreement and that the claims asserted in this litigation were "related to" P&T's "entering into" that second swap agreement. As a result, attorney fees and costs incurred in this action are recoverable under the indemnification clause found in § 10.4(iii) of the 2000 Restated Credit Agreement.

### c.    Restated Security Agreement

The district court also found that defendants were entitled to indemnification under § 14(l) (but not § 14(j)) of the 1998 Restated Security Agreement. Section 14(l) stated in part:

> Borrower agrees to pay on demand all reasonable out-of-pocket costs and expenses of Agent and each of the Lenders (including the reasonable fees and out-of-pocket expenses of Agent's and Lenders' attorneys, paralegals, accountants, auditors, and consultants) incurred by Agent and/or the Lenders in connection with the preparation, execution, delivery, administration, interpretation, amendment, waiver or enforcement of this Agreement, or in the protection of Agent's and/or the Lenders' rights hereunder (including any suit for declaratory judgment or interpretation of the provisions hereof and any bankruptcy, insolvency or condemnation proceedings involving Borrower or any Collateral).

The district court found that this language entitled defendants to indemnification for "reasonable out-of-pocket costs and expenses . . . incurred by Agent and/or the Lenders . . . in connection with the . . . interpretation . . . of this Agreement." That is, the court found it was called upon to "interpret" § 14(j) of that same Agreement, which provided that: "Nothing contained herein or in any related document shall be deemed to create any partnership, joint venture or other fiduciary relationship between Agent and Borrower and/or any Lender and Borrower for any purpose." Although defendants relied on § 14(l) to negate the existence of any fiduciary relationship, P&T had not asserted any breach of fiduciary duty with respect to the 1998 Security Agreement (or the 1998 SLOC). Any attorney fees and costs that could be showed to have been incurred specifically "in connection with" the interpretation of § 14(l) would certainly have been minimal. We find this provision cannot be the basis to order indemnification of all the reasonable costs and attorney fees incurred by defendants in this litigation. Because the other provisions do, however, we turn to the final question of whether the defendants were all entitled to indemnification.

### d.        Joint or Collective Indemnification

In a final effort to upend the judgment on the counterclaim, P&T argues that only the parties to the agreements containing the indemnity provisions should be entitled to indemnification. To be clear, however, the district court did not order that each defendant was separately entitled to indemnification. Instead, the district court found that the defendants were collectively entitled to a single recovery of the total reasonable attorney fees and costs incurred in this litigation. We find no error in this regard given the interrelated nature of the defendants, their common defense, and the scope of the indemnification provisions at issue.

While the Third Amended Complaint named six "SunTrust Entities," only three continued to exist as named: (1) SunTrust Banks, Inc., the parent company; (2) SunTrust Bank, a subsidiary of SunTrust Banks, Inc., into which SunTrust–Nashville and SunTrust–Atlanta were consolidated; and (3) SunTrust Capital Markets, Inc., also a subsidiary of SunTrust Banks, Inc., which was formerly known as STES. Both subsidiaries, or a predecessor in interest, were parties to the agreements that we find provided a basis for indemnification.

Starting with the 2000 Loan Commitment Letter, P&T agreed to indemnify both SunTrust Bank and STES for any expenses that "arise out of or in any way relate to or result from" the Commitment Letter or the financing contemplated by it. Similarly, the 2000 Restated Credit Agreement promised indemnification to SunTrust Bank, as Agent and Lender, for any and all costs arising out of litigation "related to" the entering into and performing of the 2000 Swap. We agree with the district court that either indemnity agreement was sufficiently broad to cover all the reasonable attorney fees and costs incurred in this litigation. This is particularly true in this case, where P&T asserted its claims against the "SunTrust Entities" collectively under a "joint enterprise theory." While P&T is correct that this did not alter the contractual indemnity agreements, the result was that defendants were required to defend against all of the claims and, in fact, did so under joint representation.

**AFFIRMED.**